**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 19-21583-Civ-WILLIAMS/TORRES

MSPA CLAIMS 1, LLC,

      Plaintiff,

v.

COVINGTON SPECIALTY
INSURANCE COMPANY,

      Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON PENDING MOTIONS FOR SUMMARY JUDGMENT**

      This matter is before the Court on Covington Specialty Insurance Company's ("Defendant" or "Covington") and MSPA Claims 1, LLC's ("Plaintiff" or "MSPA") cross-motions for summary judgment.  [D.E. 130, 134].  Each party filed their respective responses [D.E. 146, 152] and replies.  [D.E. 156, 161].  Therefore, the motions are now ripe for disposition.  After careful consideration of the motions, responses, replies, relevant authorities, and for the reasons discussed below, Covington's motion for summary judgment should be **GRANTED** and MSPA's motion for summary judgment should be **DENIED**.[1]

## I.  BACKGROUND

_____

[1]    On March 11, 2021, the Honorable Kathleen Williams referred the pending motions for summary judgment to the undersigned Magistrate Judge for disposition.  [D.E. 141].

On September 13, 2018, MSPA filed a two-count complaint in the United States District Court for the District of New Hampshire seeking relief under the Medicare Secondary Payer Act (the "MSP Act" or the "Secondary Payer Act") and alleging that Covington failed to reimburse a Medicare Advantage Organization ("MAOs") for medical payments made on behalf of an enrollee, P.M.[2]  The District Court of New Hampshire granted Covington's motion to transfer venue on March 21, 2019 and transferred this case to the United States District Court for the Southern District of Florida.  [D.E. 28].

MSPA is an assignee of subrogated claims, recovery, and reimbursement rights from Florida Healthcare Plus, LLC ("FHCP").[3]  FHCP is an MAO that contracted with the Centers for Medicare and Medicaid Services ("CMS") to provide Medicare benefits to eligible members enrolled in FHCP's Medicare Advantage health plan under Part C of the Medicare Act.  Plan members are referred to as "enrollees," and FHCP served the needs of its enrollees through its Medicare and managed care programs, delivered through its network of physicians and health care professionals.

---

[2]    P.M. was injured in a slip and fall accident on February 25, 2014.  P.M. was receiving Medicare benefits at the time of the injury from FHCP.

[3]    Plaintiff is a firm that obtains MSP Act claims and brings them on behalf of MAOs.  An MAO is a for-profit company that contracts with Medicare to provide Medicare coverage based on a flat rate per enrollee.  It makes or loses money to the extent it succeeds in providing the required coverage at costs less than the flat rate.

Plaintiff alleges that P.M. was a member of a Medicare Advantage Plan that FHCP managed at the time of a slip and fall.  FHCP paid approximately $2,347.89 for P.M.'s accident-related medical expenses pursuant to a contract with CMS.  The complaint also claims that Covington was the primary payer of P.M.'s injuries as a "no-fault" insurer and pursuant to a general liability policy.[4]  But, MSPA alleges that Covington failed to pay any medical services, and failed to reimburse FHCP for the payments it made on behalf of P.M. to satisfy certain medical bills.

FHCP subsequently entered into an agreement to assign its MSP Act claims to La Ley Recovery Systems, Inc. ("La Ley") on April 15, 2014.  This assigned "all of [FHCP's] rights as it pertains to the rights pursuant to any plan, State or Federal statute whatsoever directly and/or indirectly for any [of] its members and/or plan participants."  [D.E. 55-2 at § 1.1].  On February 20, 2015, La Ley entered into a separate agreement with MSPA to assign all claims for reimbursement that it acquired pursuant to the previous assignment.  In determining whether MSPA should recover damages for unpaid medical expenses and other reimbursements under 42 U.S.C. § 1395y(b)(3)(A) and 42 C.F.R. § 411.24(e), each party filed a motion for summary judgment that is now ripe for disposition.

---

[4]     The underlying insurance policy provided $5,000 in coverage for medical expenses related to bodily injuries and up to $2,000,000 in liability coverage for sums that the insured became legally obligated to pay as damages because of a bodily injury.

## II.   APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

 In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies,

are implausible.  *See Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.  ANALYSIS

Each party seeks summary judgment on the two counts listed in MSPA's amended complaint for a private cause of action under 42 U.S.C. § 1395y(b)(3(a) and for breach of contract under 42 C.F.R. § 411.24(e).  MSPA seeks summary judgment because the undisputed facts show (1) that Covington is a primary payer responsible for P.M.'s medical expenses, (2) that Covington failed to reimburse MSPA for those costs, and (3) that MPSA suffered damages.   If MSPA prevails on count one, it reasons that the Court must grant the same as to count two and award double damages and interest.

Covington, on the other hand, seeks summary judgment because MSPA cannot point to any evidence demonstrating a responsibility to pay.  And even if Plaintiff could meet that burden, Covington argues that there is still insufficient evidence that FHCP made an actual payment toward P.M.'s medical expenses. Covington also claims that MSPA failed to present any evidence or testimony "that either Plaintiff or its assignor was a party or third-party beneficiary of Covington's insurance policy, that Plaintiff obtained an assignment from any party to Covington's policy of insurance, or that would otherwise support its breach of contract claim against Covington."  [D.E. 130 at 16].  To inform the analysis that follows, we consider the general principles of the MSP Act, its underlying purposes, and how it operates in the recovery of medical expenses for enrollees.

### A.   *General Principles of the MSP Act*

In 1980, Congress passed the MSP Act to reduce the costs of Medicare.  *See Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1306 (11th Cir. 2006).  Prior to the law's passage, Medicare often acted as a primary insurer – meaning Medicare paid for an enrollees' medical expenses, even when an enrollee carried other insurance that covered the same costs, or when a third party had an obligation to pay for them. *See Bio–Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund,* 656 F.3d 277, 278 (6th Cir. 2011) ("Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained.").  The MSP Act changed that relationship so that Medicare acts as a secondary payer, where "if payment for covered services has been or is

reasonably expected to be made by someone else, Medicare does not have to pay." *Cochran v. U.S. Health Care Fin. Admin.*, 291 F.3d 775, 777 (11th Cir. 2002). "Congress's intent was to reposition the burden back to private insurers where it could best be absorbed, especially considering that these insurers had already assumed such burdens—and received the benefits—in contracts with the insured." *Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 396 (2d Cir. 2001).

The MSP Act prohibits Medicare from paying for items or services if "payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance." 42 U.S.C. § 1395y(b)(2)(A)(ii). If, however, a primary payer – in the parlance of the statute, a "primary plan" – "has not made or cannot reasonably be expected to make payment with respect to the item or service promptly," Medicare may make a payment on the enrollee's behalf, conditioned on reimbursement from the primary plan. *Id.* § 1395y(b)(2)(B)(i); *see also Cochran*, 291 F.3d at 777 ("In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if that other source is not expected to pay promptly.").

Although the MSP Act uses the term "primary plan" to describe entities with a primary responsibility to pay, that term includes more than health insurance plans. The statute defines a "primary plan" as "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability

insurance policy or plan (including a self-insured plan) or no fault insurance[.]"  42 U.S.C. § 1395y(b)(2)(A).[5]  The mechanics of the reimbursement process are also provided in the statute.  The law requires a primary plan to reimburse Medicare "if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii).  And to facilitate recovery of these payments, the law provides for a right of action by the United States, for double damages, against "any or all entities that are or were required or responsible" to make payment under a primary plan.  *See id.* § 1395y(b)(2)(B)(iii).

In addition to the Government's right of action, Congress created a private cause of action against a primary plan that fails to provide for primary payment:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

§ 1395y(b)(3)(A).  Like the cause of action afforded to the United States, the private cause of action permits private parties to recover double damages.  *See Glover*, 459 F.3d at 1307 (suggesting the MSP private cause of action was intended "to encourage private parties who are aware of non-payment by primary plans to bring actions to enforce Medicare's rights").  *Id.*  The final development in Medicare law, at least relevant to this case, is the advent of MAO's filing private causes of action

---

[5]      In 2003, Congress expanded the definition of the term "primary plan" to specify that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk." 42 U.S.C. § 1395y(b)(2)(A).

under § 1395y(b)(3)(A) against primary plans.  The Third Circuit recognized this cause of action in 2012 – *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d 353, 355 (3d Cir. 2012) – and the Eleventh Circuit followed suit in 2016.  *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1239 (11th Cir. 2016).

### B.   *Whether MSPA Asserts a New Theory of Liability*

Before turning to the merits, Covington says that the Court should not consider a settlement agreement with P.M.[6] because – at no time during the five-year lifespan of this dispute – did MSPA allege that this document was relevant as a basis for recovery.  Covington accuses MSPA of attempting to interject a new theory of liability for the first time on summary judgment and says that this cannot be considered since these allegations "change the fundamental nature of Plaintiff's claims against Covington," and otherwise appear nowhere in the underlying complaint.  [D.E. 152 at 3].  Although MSPA admits that it only learned of this settlement agreement during discovery, Covington claims this is inaccurate because it advised MSPA of this document as far back as May 2016 and exchanged emails to that effect.  Even worse, Covington says that it alerted MSPA of the settlement agreement on March 31, 2020 when it served amended answers to Plaintiff's second set of interrogatories.  [D.E. 147-4 at 4-5].  And in the months that followed, Covington maintains that MSPA never sought to amend its complaint to include

---

[6]    On April 1, 2016, Covington and P.M. entered into a settlement agreement for $16,750, and it included a release of any claims in connection with personal injuries, illnesses, and damages resulting from the underlying slip and fall accident.

any allegations in connection with this settlement agreement. So, Covington reasons that – even if the Court accepts the assertion that MSPA first learned of this document during discovery – it asks that the Court refuse to consider it because MSPA has possessed the settlement agreement for many months, failed to seek leave to amend, and may not present a new theory of liability for the first time on summary judgment.

MSPA claims that Covington's arguments are unavailing because the settlement agreement with P.M. is merely a factual assertion – not a claim – and that the inquiry can end there. However, the argument is not as simple as MSPA suggests. While MSPA is correct that some of the cases Covington relies upon are misplaced, that does not mean that Covington's argument is incorrect.

In the Eleventh Circuit and "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir. 2006). A party may not, however, amend a complaint with new claims presented in summary judgment papers. *See Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1282 (11th Cir. 2009) ("Because Corey cannot amend its Complaint by adding a new claim in its summary judgment papers, we will not discuss conduct beyond the scope of the Second Amended Complaint.") (citing *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004)). Indeed, "Eleventh Circuit precedent establishes that a party impermissibly asserts a new claim at the summary judgment stage where the party

asserts new facts that would provide a new theory of recovery." *Arthur v. Thomas*, 2014 WL 466143, at \*4 (M.D. Ala. Feb. 5, 2014) (citing *Merle Wood & Assocs., Inc. v. Trinity Yachts, L.L. C.,* 714 F.3d 1234 (11th Cir. 2013); *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244 (11th Cir. 2012)). And most importantly, "[t]he new claim need not involve [the] assertion of an entirely independent legal right but new facts that would provide a theory of recovery under a previously asserted legal right." *Id.*

These principles apply here because – even though Plaintiff has previously asserted a private cause of action under 42 U.S.C. § 1395y(b)(3)(a) and does not seek to add any new legal claims – there is never any mention of a settlement agreement rendering Covington a primary payer in count one. The amended complaint only claims that Covington is a primary payer because of "no-fault and liability policies[.]" [D.E. 55 at ¶ 51 ("Defendant's no-fault and liability policies are primary plans, which rendered Defendant a primary payer for accident-related medical expenses.")]. So, while MSPA does not seek to add any new causes of action, the settlement agreement is more than just a simple factual assertion that Plaintiff omitted because it turns on whether Covington is a primary payer and whether there is an alternative method to recover damages. *See also Cruz v. Advance Stores Co.,* 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) (prohibiting plaintiff from introducing new facts that would establish a new theory of negligent supervision at summary judgment even though the complaint already contained a claim for negligent supervision).

Two Eleventh Circuit cases explain how this principle operates in practice. In *GeorgiaCarry,* the plaintiffs claimed, among other things, that a Georgia law infringed on their right to free exercise of religion because it prohibited them from carrying firearms into houses of worship.  *See GeorgiaCarry.Org, Inc.*, 687 F.3d at 1249.  The plaintiffs then included additional facts for the first time on summary judgment stage in an attempt to strengthen their allegations that the state burdened their religious rights.  *Id.* at 1258 n.27.  But, the Eleventh Circuit refused to consider these additional facts and a new theory of a Free Exercise violation because they did not go hand in hand with the underlying complaint.

The same is true in *Merle Wood*, where the plaintiff attempted to present factual assertions on when it conferred a benefit toward the defendant.  The new facts, if considered, would have altered the statute of limitations with a different theory on when the plaintiff conferred a benefit.  *See Merle Wood & Assocs., Inc.,* 714 F.3d at 1238.  The Eleventh Circuit held that this was another improper attempt to amend a complaint because "[p]laintiffs are masters of their claims," and a court may "not simply ignore the allegations in the complaint" at the summary judgment stage.  *Id.*  The takeaway from both decisions is that, even though plaintiffs may not assert any new legal rights or causes of action, any attempt to add new facts at summary judgment is also improper if it presents a new theory of recovery under a previously asserted right.

MSPA has done the same here because, although there is no request to add a separate legal claim for a private cause of action under 42 U.S.C. § 1395(y)(b)(3)(A),

the new facts in connection with the settlement agreement would allow a new theory of recovery.   In other words, if the Court considered the settlement agreement that appears nowhere in the amended complaint, it would give MSPA an alternative way of satisfying the elements needed to sustain a private cause of action and collect damages.   That means that the settlement agreement is not just some run-of-the-mill factual assertion that can be omitted because it provides a completely different theory of recovery and an alternative way for MSPA to meet the elements to sustain a private cause of action.   *See, e.g., Arthur*, 2014 WL 466143, at *4 ("It is an entirely distinct theory of Eighth Amendment violation and is an improper attempt by Arthur to amend his complaint at the summary judgment stage."); *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1272-73 (N.D. Ala. 2014) (stating that plaintiffs may not revise the allegations in a complaint in "any critical manner" without seeking leave to amend).

Apart from this, MSPA says that the Court should still consider the settlement agreement with P.M. because Covington cannot claim any surprise or prejudice.   While that might be true in some respects, that is not the standard in determining whether a Court can consider matters outside of a complaint that raise new theories of recovery on summary judgment.   Like the Eleventh Circuit made clear in *Merle Wood*, a plaintiff is a master of his complaint and, if MSPA wanted to add alternative theories for satisfying the elements under 42 U.S.C. § 1395y(b)(3)(A), it had every opportunity to do so prior to summary judgment.   *See Battle v. McHugh*, 2013 WL 3150155, at *16 (N.D. Ala. June 14, 2013) (noting that

13

"the Eleventh Circuit has clearly said that the complaint controls the claims before the court") (citing *Flintlock Construction Services, LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1226-28 (11th Cir. 2013)).  Yet, MSPA failed to take any action and the time to amend has long since passed.  *See Pensacola v. City of Pensacola*, 2015 WL 12516688, at *3 (N.D. Fla. Mar. 13, 2015) ("To revise or expand on their claims, plaintiffs must amend their complaint.") (citing *Flintlock*, 710 F.3d at 1228; *Mobley v. Chatham Cty., Ga.*, 2011 WL 1226223, at *3 n.4 (S.D. Ga. Mar. 9, 2011) ("It may be argued that [plaintiff] expanded on his claim in his deposition testimony and other filings, but his complaint, as unamended, controls the issues to be litigated.")).  Therefore, given that the settlement agreement between Covington and P.M. is not included in any complaint filed thus far, MSPA cannot use it on summary judgment for the purpose of asserting a new theory of liability.

## C.   *Count I: A Private Cause of Action under § 1395y(b)(3)(A)*

Having resolved that preliminary issue, the next question is whether MSPA meets all the requirements to sustain a private cause of action under § 1395y(b)(3)(A).  That requires MSPA to show with evidence that Covington is a primary payer of P.M.'s medical expenses, that it failed to pay for those costs, and that damages occurred due to a lack of payment.  *See W. Heritage Ins. Co.*, 832 F.3d at 1239 ("[A] plaintiff is entitled to summary judgment on a § 1395y(b)(3)(A) claim when there is no genuine issue of material fact regarding (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount.").  Covington says that

MSPA meets none of these elements and that arguments presented are both factually and legally incorrect.

### *(1) Whether Covington is a Primary Payer*

MSPA says that Covington is a primary payer of P.M.'s medical expenses because (1) it reported medical payments coverage to CMS via mandatory reports, and (2) it issued a no-fault insurance policy to the owner of the property where the underlying slip and fall took place.  To determine if Covington is a primary payer of P.M.'s medical expenses, that requires a look at how the MSP Act defines a primary plan:

> In this subsection, the term 'primary plan' means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies.  An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

42 U.S.C. § 1395y(b)(2)(A).

The MSPA Act also describes several ways to demonstrate a primary plan's responsibility:

> A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

42 U.S.C. § 1395y(b)(2)(B)(ii); *see also* 42 C.F.R. § 411.22 (stating that a primary payer's responsibility may be demonstrated by "(1) A judgment; (2) A payment

conditioned upon the beneficiary's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary payer or the primary payer's insured; or (3) By other means, including but not limited to a settlement, award, or contractual obligation."). Given the different methods to demonstrate a primary plan's responsibility, we consider the following arguments to determine if Covington meets this requirement.[7]

### (2) *Whether Section 111 Reporting Renders Covington a Primary Plan*

MSPA's first argument relies on the mandatory reporting requirements of the MSP Act. The statute requires group health plans, workers' compensation, and no-fault and liability insurers to follow certain requirements when submitting plan information to CMS. *See* 42 U.S.C. § 1395y(b)(7)–(8). This occurs on a quarterly basis, where plans must identify and submit information on Medicare beneficiaries and, to encourage compliance with these mandatory reporting requirements, Congress authorized CMS to impose discretionary penalties of up to $1,000 per day as a sanction for non-reporting. The applicable plan shall determine, for example, "whether a claimant . . . is entitled to benefits under the program" and, "if the claimant is determined to be so entitled," then the plan shall submit the required information to the Secretary. *Id.* § 1395y(b)(8)(A). This is commonly referred to as

---

[7]    MSPA adds that Covington confirmed its primary payment status with notice of the settlement agreement with P.M. But, as we stated earlier, the settlement agreement cannot be used to meet the elements for a private cause of action if MSPA never alleged that theory of liability in the amended complaint. We will therefore omit any further discussion of MSPA's arguments in connection with the settlement agreement.

"Section 111 reporting" and it "enable[s] the Secretary to make an appropriate determination concerning coordination of benefits, including any applicable recovery claim." *Id.* § 1395y(b)(8)(B). MSPA says that, when Covington complied with Section 111, it established itself as a primary payer of P.M.'s medical expenses.

Covington's response is that "[s]imply because a claimant is entitled to Medicare benefits does not mean that the applicable plan will make a primary payment." [D.E. 152 at 6]. Covington says that this is consistent with the statute's corresponding regulations, where it requires a primary payer to provide additional information to CMS only "[i]f it is demonstrated to a primary payer that CMS has made a Medicare primary payment for services for which the primary payer has made or should have made[.]" 42 C.F.R. § 411.25(a). If this demonstration is met, the primary payer "must provide notice about primary payment responsibility and information about the underlying MSP situation to the entity or entities designated by CMS to receive and process that information." *Id.* And since Covington only filed a mandatory report in this case, it reasons that MSPA has improperly conflated a reporting requirement with an admission of liability. Thus, even if Covington complied with certain mandatory reporting requirements, it says that this cannot establish any responsibility for making an actual payment to P.M.'s medical expenses.

MSPA's counterargument is that "[i]t is undisputed that Defendant reported its primary payer status for P.M." [D.E. 161 at 3 n.7] and that Covington admitted as much when it served amended answers to a second set of interrogatories. [D.E.

147-4]. This argument misses the mark, in some respects, because the question is not simply whether Covington reported any information to CMS in connection with Section 111 but whether a mandatory disclosure rendered it a primary payer. And that is an entirely separate question. MSPA then says that "Defendant's Section 111 reporting to CMS provides proof of Defendant's knowledge of its status as a primary payer and establishes the first element of Plaintiff's claim." [D.E. 161 at 3]. Although this sentence is by itself too conclusory, MSPA references several items in footnote six of its reply where the law and the facts supposedly give additional support to the conclusion that Covington is a primary payer.[8]

MSPA first relies on the deposition testimony of Covington's corporate representative, Michael DeMint ("Mr. DeMint"), to argue that Defendant reported its primary payer status to CMS sometime between November 2014 and January 2015:

> Q: Okay. So if we go back and you have a November 2014 date when you're telling me that you actually had the necessary data elements to be able to report the medical payments coverage, we agree that

---

[8] Although the undersigned will consider all the cases, arguments, and evidence presented in MSPA's footnotes for the sake of completeness and accuracy, it is never wise for a party on summary judgment to rely on factual or legal conclusions and to then bury those items in footnotes. *See, e.g.*, *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. The evidence presented cannot consist of conclusory allegations or legal conclusions.") (citations omitted); *see also Hamilton v. Southland Christian Sch., Inc.,* 680 F.3d 1316, 1319 (11th Cir. 2012) (noting that an appellant waives a claim on appeal when he either makes no reference to it, only passing references to it, or raises it in a perfunctory manner without supporting arguments and authority).

because that quarter ends in December of 2014, but by January 15 – January 15 of the next year, you would have expected that that claim would have been reported, assuming that it works well through the ISO system and all that; right?

A: Yes.

[D.E. 135-6 at 145:18-146:2]. However, MSPA's reliance on this testimony is overstated because – while Mr. DeMint confirmed that Covington complied with Section 111 in between November 2014 and January 2015 – nothing about this testimony answers the *legal question* as to whether the disclosure rendered Covington a primary payer.

MSPA next turns to the deposition testimony of Defendant's expert in Medicare Compliance, Travis Smith ("Mr. Smith"), where he opined that Covington's actions rendered it a primary payer of P.M.'s medical expenses:

Q: Do you agree with me that to the extent that an insurance company like Covington –
A: Yes.
Q: -- reports through Section 111, they've accepted responsibility under RRE [Responsible Reporting Entity] and, therefore, it's tantamount to party admission that there is coverage correct?
A: When they're reporting RRE, yes, they're saying that they are the primary payer, so –

[D.E. 135-12 at 74:11-19].[9] This testimony, while more relevant than Mr. DeMint's, is not dispositive because it only represents an individual lawyer's personal view of whether Covington's actions rendered it a primary payer. However, the question

---

[9]     Covington says that MSPA has taken Mr. Smith's deposition testimony out of context because he later testified that Section 111 reporting does not make a carrier automatically liable for reimbursing an MAO nor does it qualify as an admission or acceptable of liability.

here is a legal one, where it must be answered with references to case law, statutes, or other authorities as opposed to a deponent's personal interpretation of how a statute operates. *See, e.g.*, *McCleary v. DLJ Mortg. Cap., Inc.*, 2017 WL 4542054, at *4 (S.D. Ala. Oct. 11, 2017) ("Whether conduct of a servicer falls within the prohibition on claims of negligent or wanton loan servicing, however, is a legal question that must be answered by legal authority and legal reasoning"). So, while the Court will consider Mr. Smith's legal understanding of the MSP Act, it does not mean that his interpretation is correct or that Covington qualifies as a primary payer.

Anticipating this shortfall, MSPA directs our attention to the Eleventh Circuit's decision in *MSP Recovery Claims, Series LLC v. Ace Am. Ins. Co.*, 974 F.3d 1305, 1319 (11th Cir. 2020), to show that primary payer responsibility may be demonstrated with Section 111 reporting.[10] Plaintiff says that *Ace* stands for the proposition that a plaintiff need only show that a primary payer defendant has actual or constructive knowledge of its obligation to reimburse a secondary payer and that nothing more is required. *See id.* ("Although primary payers must have knowledge that they owed a primary payment before a party can claim double

---

[10] MSPA also relies on the Court's decision in *W. Heritage Ins. Co.*, 832 F.3d at 1239, where the Court stated that "[s]ixty days after Western tendered the settlement to the Reales and their attorney . . . Western became obligated to directly reimburse Humana." But, the Eleventh Circuit never considered the question of whether Western Heritage (i.e. the insurer) qualified as a primary plan. The Court's discussion was instead limited to the second and third elements for a private cause of action under 42 U.S.C. § 1395(y)(b)(3)(A). *See id.* at 1239 ("We discuss the second and third elements in turn below.").

damages under the Medicare Secondary Payer Act, *see Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1309 (11th Cir. 2006); *see also* 42 C.F.R. § 411.24(i)(2), Plaintiffs plausibly alleged that Defendants had such knowledge.").

The problem with MSPA's reliance on *Ace* is that Plaintiff has taken this case out of context.  When the Eleventh Circuit made a brief remark on primary payers, it did so only in connection with the requirements to survive a motion to dismiss. That is why the Court stated that "the filings with HHS [i.e. the Section 111 reports] evidence Defendants' knowledge that they owed primary payments," and sufficed to "plausibly allege[] Defendants' actual or constructive knowledge[.]".  *ACE Am. Ins. Co.*, 974 F.3d at 1319.  That does not mean, however, that MSPA can rely solely on the same mandatory reports and allegations that enabled it to survive a motion to dismiss.  And nothing in *Ace* holds that the satisfaction of the reporting requirements under Section 111 establishes an insurer as a primary payer; it merely shows a plaintiff can present enough plausible allegations to survive a motion to dismiss.  MSPA is therefore taking an Eleventh Circuit decision on a motion to dismiss and applying it to a motion for summary judgment when *Ace* did not grapple with the question presented here.  This might explain why there is no substantive discussion of *Ace* in MSPA's summary judgment papers because the holding it seeks does not exist.

A more analogous case, albeit also on a motion to dismiss, is a district court's decision in *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, 2021 WL 1164091, at *6 (S.D.N.Y. Mar. 26, 2021), where the court found that, when an

insurance company becomes aware that a Medicare beneficiary is injured in an accident and where a policy may provide coverage, the insurance company is obligated to report it to CMS:

> Anytime an insurance company becomes aware that a Medicare beneficiary was injured in an accident for which it (or a direct subsidiary) wrote a policy that may provide coverage, the insurance company is obligated to report it to CMS. Insurance companies are required to submit such claim information "regardless of whether or not there is a determination or admission of liability." 42 U.S.C. § 1395y(b)(8)(C).

*Id.* (internal citation omitted).

The district court considered the question of whether a defendant admits primary payer status with the filing of mandatory reports with CMS. Like MPSA, the plaintiff argued that "the MSP Act itself requires 'applicable plans' to acknowledge and accept primary payer responsibility'" and that "by listing itself on the CMS reporting, each Defendant has admitted that it is the primary plan at issue for the respective exemplar claims." *Id.* at *12. But, the court found that argument unpersuasive, in part, because of the CMS operating policy that allows for the reporting of Section 111 claims merely for the purpose of *potentially* providing coverage[11]:

---

[11]    The district court acknowledged that *Ace* reached a different conclusion on a motion to dismiss. But, the district court distinguished *Ace* because – although the Eleventh Circuit found that insurance companies' reports to CMS were evidence on a motion to dismiss "that [the insurers] owed primary payments, including the primary payments for which Plaintiffs seek reimbursement" – *Ace* "neither acknowledged nor addressed Defendants' argument" that "primary payers must report to CMS regardless of whether there was a conditional payment and regardless of whether or not there is an admission or determination of responsibility." *Id.* at *6 n.11.

> The CMS operating guidance makes clear that CMS reporting does not constitute an admission by the reporting entity that it is the primary plan in connection with the reported event; instead, such reporting simply confirms that the reporting entity or a direct subsidiary of the reporting entity *may* provide coverage for the accident.

*Id*. (emphasis in original).

This is consistent with earlier Eleventh Circuit decisions that considered alternative ways a primary plan's responsibility is established.  Take, for instance, the Eleventh Circuit's decision in *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1361 (11th Cir. 2016).  There, the Court acknowledged that a primary plan's responsibility to pay may be satisfied "by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii).  The Court also focused on the question of whether the phrase "by other means" permits a demonstration of responsibility by a contractual obligation.  Although we have not yet reached that question here (more on that later), the Eleventh Circuit made clear that plaintiffs must support their complaints with *evidence* to render an insurer responsible for the actual payment of expenses that plaintiffs seek to recover:

> We hold that a contractual obligation may serve as sufficient demonstration of responsibility for payment to satisfy the condition precedent to suit under the MSP Act.  This does not relieve Plaintiffs of their burden to allege in their complaints, and then subsequently prove with evidence, that Defendants' valid insurance contracts actually render Defendants responsible for primary payment of the expenses Plaintiffs seek to recover.  And Defendants may still assert any valid contract defense in arguing against their liability.  We hold only that a

> contractual obligation may satisfy the demonstrated responsibility
> requirement, not that the existence of a contractual obligation
> conclusively demonstrates liability under the MSP Act's private cause
> of action.

*Allstate Ins. Co.*, 835 F.3d at 1361.

Based on the holding in *Allstate* – where a contractual obligation requires plaintiffs to "prove with evidence" that the defendants were responsible for the primary payment of expenses – we do not see how the mandatory reports to CMS can escape the same requirement when the purpose of those reports is to simply confirm that coverage *may* exist. *See, e.g.*, *In re Dow Corning Corp.*, 250 B.R. 298, 339 (Bankr. E.D. Mich. 2000) (rejecting the Government's interpretation of the MSPA where it asserted "that it could recover from any party that qualifies as a primary plan or received payment from a primary plan and which makes or can reasonably be expected to make a payment to a Medicare beneficiary, even if the payment made or expected to be made by that party is entirely unrelated to the medical care paid for by the Government.").

The district court in *AIG Prop. Cas. Co.* cast doubt on the same premise because otherwise it would make every insurer that complies with the mandatory reporting requirements of the MSP Act a primary payer even though it is speculative that an actual payment would ever be made. *See AIG Prop. Cas. Co.*, 2021 WL 1164091, at *6 ("Plaintiff's underlying premise — if a claim is reported to CMS, then any medical expense that may be associated with the claim is reimbursable by the entity that reported the claim — is factually inaccurate."). This highlights the differences between a motion to dismiss and a motion for

summary judgment because the former can rely on plausible allegations to seek discovery in support of allegations whereas the latter requires some evidence to establish that an insurer is, in fact, a primary payer.

If Plaintiff's interpretation of the MSP Act was correct, it would be inconsistent with the text of the statute. The law states that an MAO's reimbursement rights accrue only "if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii). That means the MSP Act requires an MAO to *demonstrate* that a primary plan "has or had a responsibility to make payment," not that primary payer status is imposed automatically for complying with mandatory reporting requirements. *Id.* If MAOs and their assignees could demonstrate that an insurer constitutes a primary payer simply with mandatory reporting requirements, it would be inconsistent with *Allstate* to the extent it requires a plaintiff to come armed with evidence on summary judgment.

Relying on mandatory reporting requirements also does not go hand in hand with the MSP Act because it requires a primary plan's responsibility to be demonstrated "by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii). And mandatory reporting requirements is noticeably not on this list and MSPA never offers an explanation as to how it suffices under the text of the

statute or its implementing regulations.   So, considering that we have found no support for the argument that an insurer's compliance with Section 111 reporting requirements is sufficient for summary judgment purposes, MSPA has failed to demonstrate that Covington is a primary payer.

### (3) Whether an Insurance Policy Renders Covington a Primary Payer

MSPA's second argument is that Covington is a primary payer under the MSP Act because it issued an insurance policy to the owner of the property where P.M. slipped and fell.   [D.E. 161 at 6 ("Defendant has demonstrated its responsibility of this claim by virtue of its 'contractual obligation' to its insured for the no-fault coverage, Defendant reporting itself as primary pursuant to its Section 111 and, for some Medicare claimants such as P.M., through settlements.")].   When looking at the statutory language of the MSP Act and the relevant cases thereto, the mere presence of an insurance contract does not, without more, demonstrate that Covington is a primary plan.

However, as stated earlier, the MSP Act permits demonstration of a primary plan's responsibility to pay "by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii).   And the implementing regulations clarify the means by which responsibility for payment may be demonstrated, including a judgment or "other means, including but not limited to a settlement, award, or *contractual*

*obligation.*"  *Id*. § 411.22(b) (emphasis added).   Hence, MSPA is correct that a contractual obligation can demonstrate that Covington is a primary plan.  *See Allstate,* 835 F.3d at 1355 (in addition to a judgment, a settlement, or by other means, a "*contractual obligation*" can demonstrate responsibility under the MSP Act as well) (emphasis added).

The presence of a contract is not, however, dispositive of whether an insurer constitutes a primary payer.  The Eleventh Circuit made that clear in *Allstate* when finding that, while "a contractual obligation may satisfy the demonstrated responsibility requirement," there is still a requirement that plaintiffs "subsequently prove with evidence, that Defendants' valid insurance contracts actually render Defendants responsible for primary payment of the expenses Plaintiffs seek to recover."  *Allstate Ins. Co.*, 835 F.3d at 1361.  "And Defendants may still assert any valid contract defense in arguing against their liability."  *Id.* Thus, if MSPA seeks to demonstrate Covington as a primary payer via a contractual obligation, there must be some evidence that renders the latter responsible for the payment of P.M.'s expenses.  *See Ocean Harbor Cas. Ins. v. MSPA Claims, 1*, 261 So. 3d 637, 645 (Fla. 3d DCA 2018) (following *Allstate* and requiring an MAO to carry its burden to prove with evidence that an insurer's contract renders the defendant responsible for primary payment of the expenses that plaintiffs seek to recover).

*(4) Whether the MSP Act Preempts the State Insurance Policy*

MSPA claims that there is no need to explore the question of whether Covington was responsible for P.M.'s medical expenses under the insurance policy because the MSP Act preempts state laws, regulations, and contracts. *See Mao-Mso Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 3420796, at *9 (C.D. Ill. July 13, 2018) ("[S]tate contract laws are likely preempted by the MSP Act to the extent they interfere with Plaintiffs' reimbursement rights.") (citing *Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 196 (S.D.N.Y. 2012) (finding that New York's anti-subrogation statute was expressly preempted by the Medicare Act as it applied to Medicare and MA organization reimbursement rights). MSPA relies heavily on the preemption section of the MSP Act and its implementing regulations, where it provides that standards established through CMS's Medicare Advantage regulations "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations[.]" 42 U.S.C. § 1395w-26(b)(3); *see also* 42 C.F.R. § 422.402 ("The standards established under this part supersede any State law or regulation with respect to the MA plans which are offered by MA organizations."); 42 C.F.R. § 422.108(f) ("Consistent with § 422.402 concerning the Federal preemption of State law, the rules established under this section supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans."). Thus, MSPA concludes that any policy requirements that that might otherwise bar coverage are inapplicable.

MSPA's strongest argument is based on 42 C.F.R. § 422.108(f) because it preempts the consideration of contractual requirements. *See* 42 C.F.R. § 422.108(f) ("Consistent with § 422.402 concerning the Federal preemption of State law, the rules established under this section supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans."). The other provisions that MSPA references all apply to either state laws or regulations and – given that the question here concerns the preemption of an insurance contract – those do not apply. *See* 42 U.S.C. § 1395w-26(b)(3) ("The standards established under this part shall supersede *any State law or regulation* (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.") (emphasis added); 42 C.F.R. § 422.402 ("The standards established under this part supersede *any State law or regulation* with respect to the MA plans which are offered by MA organizations.") (emphasis added).

This narrows the preemption analysis down to 42 C.F.R. § 422.108(f). But, neither party referenced a case where a court has opined specifically on the preemption language in this regulation and how it impacts a state insurance policy. Covington identifies, however, several analogous cases with the most compelling being the Third District's decision in *Ocean Harbor Cas. Ins. v. MSPA Claims, 1*, 261 So. 3d 637, 645 (Fla. 3d DCA 2018), where the plaintiff argued that the MSP Act preempted most of Florida's no-fault insurance laws through 42 U.S.C. § 1395y(b)(3)(A). The Third District disagreed with the argument that the MSP Act

preempted all statutes under Florida law because the "[t]he Secondary Payer Act was never intended to broadly preempt State insurance law." *Id.* Instead, the Court found that "the Secondary Payer Act envisions the full enforcement of state insurance law, particularly full payments under State laws – but only when the conditions of those state insurance laws are met, subject to the condition that Medicare is secondary." *Id.* (citing *Allstate*, 835 F.3d at 1361).

The Third District also explained that "the Secondary Payer Act *does not supersede an existing State insurance policy*; it merely requires the exhaustion of the benefits under that policy." *Id.* at 644 (emphasis added) That led the Third District to opine that a private cause of action does not arise under § 1395y(b)(3)(A) until Medicare makes a conditional payment and the plaintiff shows that the insurer is required to make a payment in the first place:

> Indeed, the private cause of action under § 1395y(b)(3)(A) does not arise until Medicare makes a conditional payment when payment "can reasonably be expected to be made . . . under no fault insurance." 42 U.S.C. § 1395y(b)(2)(B)(ii). A payment "can reasonably be expected to be made" only when the applicable no fault policies and statutes require the payments. Thus, for each reimbursement it claims, MSPA must demonstrate that, not only did it make a proper conditional payment under Medicare law, *but also that Ocean Harbor was required to make the payment in the first instance* under Florida no-fault law.

*Id.* at 644.

MSPA's rebuttal is that any reliance on *Ocean Harbor* is misplaced because it constitutes a non-binding state court opinion, has little to do with the facts here, and was decided on a motion for class certification as opposed to a motion for

summary judgment.  [D.E. 146 at 7].  But, MSPA overlooks how *Ocean Harbor* came to this conclusion and how it carefully pronounced these preemption principles.

*Ocean Harbor* relied on the Fifth Circuit's decision in *Caldera v. Ins. Co. of the State of Pa.*, 716 F.3d 861, 865 (5th Cir. 2013), where the plaintiff failed to obtain preauthorization for certain surgeries but wanted to sue his employer for double damages under Section 1395y(b)(3)(A).  The underlying Texas law required a preauthorization for major surgeries and – having failed to obtain that – the plaintiff argued that federal law preempted the state law requirement.  The Fifth Circuit rejected that assertion because Congress never "intend[ed] to override a primary payer's ability to impose medical necessity requirements in accordance with state law."  *Id*. at 867.  As a result, the Court held that "if a claimant *fails to file a proper claim in accordance with state-law requirements* and, therefore, cannot recover benefits from the primary payer, . . . the claimant cannot succeed under MSP Act."  *Id*. (emphasis added).

MSPA says that *Caldera* should not be given much consideration because the regulations that formed the basis of that decision do not apply here, and the state worker compensation law was otherwise in harmony with the MSP Act.  While both of those assertions are accurate to some extent, the principles flowing from *Caldera* remain applicable.  That is, after the Fifth Circuit reviewed the MSP Act, it broadly pronounced that "[t]he MSP and its implementing regulations do not . . . extend so far as to eviscerate all state-law limitations on payment."  *Id*. at 864.  The Court also found that its interpretation was consistent with other cases holding "that a

claimant may not recover amounts from a purported 'primary plan' in excess of a carrier's responsibility under state law or the relevant contract." *Id.* (citing *Bradley v. Sebelius,* 621 F.3d 1330, 1337 (11th Cir. 2010); *Estate of Foster v. Shalala,* 926 F. Supp. 850, 864–65 (N.D. Iowa 1996)).

What makes *Caldera* even more persuasive is the Eleventh Circuit's decision in *Western Heritage Insurance Company*.  There, the Eleventh Circuit looked to Section 1395y(b)(3)(A) and found that the term "'primary plan' *presupposes* an existing obligation (whether by statute or contract) to pay for covered items or services." *W. Heritage Ins. Co.*, 832 F.3d at 1237 (citing §1395y(b)(2)(A)) (emphasis added).  The Court further reasoned that a primary plan "'fails to provide for primary payment (or appropriate reimbursement)' [thus triggering the private cause of action] when it fails to honor the underlying statutory or contractual obligation." *Id*. at 1237 (quoting § 1395y(b)(3)(A)).  That means the Eleventh Circuit, much like the Fifth Circuit, recognized that a MAO must demonstrate that an insurance carrier "fail[ed] to honor the underlying statutory or contractual obligation." *Id.*

When juxtaposing these cases with the preemption language in 42 C.F.R. § 422.108(f), MSPA's argument falls short because – although this regulation generally supersedes state laws, regulations, and contractual requirements – it is not as far reaching as MPSA suggests.  And the reason preemption is not all encompassing is because the definition of primary plan under the MSP Act "*presupposes* an existing obligation (whether by statute or contract) to pay for

covered items or services." *W. Heritage Ins. Co.*, 832 F.3d at 1237 (citing

§1395y(b)(2)(A)) (emphasis added).   That means neither the MSP Act nor its

regulations can "override a primary payer's ability to impose medical necessity

requirements in accordance with state law," because it would otherwise be

preempting something that is already allowed under the statute. *Caldera*, 716 F.3d

at 865.   So, while the language under 42 C.F.R. § 422.108(f) generally supersedes

state laws, regulations, contractual requirements, and other standards, it does not

eliminate the requirement that MSPA must show that Covington is responsible for

the payment of expenses that Plaintiffs seek to recover.[12]   *See Ocean Harbor Cas.

Ins.*, 261 So. 3d at 644 ("Contrary to MSPA's arguments, the Secondary Payer Act

does not eliminate the terms and conditions of underlying State no fault law."); *see

also MSPA Claims 1, LLC v. First Acceptance Ins. Co., Inc.*, 380 F. Supp. 3d 1235,

1241 (M.D. Fla. 2019) (agreeing with *Ocean Harbor* that the MSP does not

supersede an existing state insurance policy and finding that "MSPA points to no

authority stating otherwise").

---

[12]    The same principles apply to Florida's no-fault insurance law because, although Plaintiff claims that the MSP Act preempts everything under state law, "the Secondary Payer Act envisions the full enforcement of state insurance law, particularly full payments under State laws – but only when the conditions of those state insurance laws are met, subject to the condition that Medicare is secondary." *Ocean Harbor Cas. Ins.*, 261 So. 3d at 645 (citing *Allstate*, 835 F.3d at 1361).

### (5) *Whether Covington Failed to Exhaust Administrative Remedies*

MSPA's following argument is that – much like preemption – Covington cannot dispute any reimbursements owed, including the reasonableness, relatedness, or necessity[13] of any medical bills because it failed to exhaust its administrative remedies.  MSPA contends that, if Covington wanted to dispute a claim, it should have already done so.  But, given that the time to exhaust administrative remedies passed long ago, MSPA opposes Covington launching a collateral attack on the propriety of any amounts paid.

For support, MSPA relies on 42 C.F.R. § 422.566(b) because, when a MAO is billed for medical expenses, the MAO determines (1) whether those expenses are covered under the relevant health insurance policy and, if so, (2) how much to pay.  *See* 42 C.F.R. § 422.56(b).  MSPA claims that an MAO's initial decision on coverage for a Medicare enrollee's medical expenses is called an "organization determination" and that this includes a MAO's actual payment for a Medicare enrollee's medical expenses.[14]  *Id*.  If any party wishes to challenge an "organization determination,"

---

[13]    Florida's no-fault insurance law authorizes an insurer to decline payment or reduce payment if "the claim was unrelated was not medically necessary, or was unreasonable or that the amount of the charge was in excess of [certain statutory limits and schedules]."  Fla. Stat. § 627.736.  Courts also hold that this is a plaintiff's burden, not an insurer.  *See Msp Recovery Claims, Series LLC v. Aix Specialty Ins. Co.*, 2020 WL 5524854, at *11 n.7 (M.D. Fla. Aug. 10, 2020) ("It is Plaintiffs' burden—not AIX's—to show that the expenses are reasonable and necessary, and they provided no evidence to satisfy that burden.") (citation omitted).

[14]    The MSP Act defines an organization determination as a decision "regarding whether an individual enrolled with the plan of the organization under this part is entitled to receive a health service under this section and the amount (if any) that the individual is required to pay with respect to such service."  § 1395w-22(g)(1)(A).

MSPA says that the "party must exhaust its administrative remedies by following a specific procedure for administrative appeal prescribed by the Medicare Act and its implementing regulations." *Tenet Healthsystem GB, Inc. v. Care Improvement Plus S. Cent. Ins. Co.*, 875 F.3d 584, 587 (11th Cir. 2017) (citing 42 U.S.C. § 1395w–22(g); 42 C.F.R. §§ 422.560–422.622). Since Covington failed to do so, MSPA concludes that any challenge to the reasonableness, relatedness, or necessity of the amount paid cannot be collaterally attacked in litigation.

MSPA's argument fails for at least two reasons. First, MSPA fails to point to anything in the record where Covington could have appealed an "organization determination." MSPA merely mentions that too much time has passed for an appeal to take place and that Covington failed to act accordingly. But, without any evidence that an "organization determination" could have been appealed, the argument that Covington failed to comply with this requirement rings hollow.

Second, even if an "organization determination" existed and Covington failed to exhaust its rights, there is nothing in the MSP Act's regulations that create a federal administrative remedy for an insurer like Covington to make this challenge. MSPA references, as support, the language of 42 C.F.R. § 422.566. But, "only enrollees, providers furnishing services to enrollees, or enrollee's estates can request an organization determination" under this regulation. *Ocean Harbor Cas. Ins.*, 261 So. 3d at 647 (citing 42 C.F.R. §§ 422.566). Indeed, "[n]owhere is a primary [plan] given the right to request a determination regarding its

responsibility to make a particular payment or the right to seek administrative review of such a determination." *Id*.

The Third District examined this same issue in *Ocean Harbor*, where after taking a close look at the statutory text and the regulations promulgated under the MSP Act, the appellate court found that nothing allows a primary plan to administratively contest a particular payment:

> [W]e see nothing in these regulations whereby a primary plan like Ocean Harbor could administratively contest a determination by MSPA that Ocean Harbor was responsible to make a particular payment. The cases cited by MSPA in support of its argument are inapposite. They concern the requirement that a Medicare enrollee exhaust administrative remedies before suing Medicare in federal court. None of those cases stand for the proposition that a primary plan had to exhaust administrative remedies before defending a claim that it was the responsible primary plan for a medical bill.

*Id*. at 647.

The reason the Third District found no regulation applying to a primary plan is because – when Congress created a "right of appeal for secondary payer determinations relating to . . . no fault insurance" – it specifically excluded MAOs. *Id*. Congress instead made the administrative remedy available only to the Secretary's decisions and "for which the Secretary is seeking to recover conditional payments from an applicable plan . . . that is a primary plan[.]" 42 U.S.C. § 1395y(b)(2)(B)(viii). The Third District explained this issue thoroughly in *Ocean Harbor* because, during the notice and comment period for the MSP Act's regulations, the Secretary noted that beneficiaries have formal appeal rights whereas primary plans do not:

During the notice and comment period for the regulations, various commenters requested the regulations be made applicable to Secondary Payer actions by MAO's created by Part C, but the Secretary declined: "This request is outside of the scope of this rule. The SMART Act amended only the MSP [Medicare Secondary Payer] provisions for Medicare Part A and Part B." Fed. Reg. 80, 39 sec. II.B., 8 at 10616 (Friday, Feb. 27, 2015) (codified at 42 C.F.R. § 405). Indeed, referring to the regulations that existed prior to the adoption of regulations pursuant to the SMART Act, the Secretary noted that "[u]nder our existing regulations under part 405 subpart I, beneficiaries have formal appeal rights; applicable plans do not have such rights." Fed. Reg. 80, 39, at 10613.

*Ocean Harbor Cas. Ins.*, 261 So. 3d at 647.

Not be deterred, MSPA redirects our attention to the Eleventh Circuit's decision in *Western Heritage* because an individual there failed to contest the amount of a reimbursement and waived her rights as a result. *See W. Heritage Ins. Co.*, 832 F.3d at 1240 ("Before Western settled with the Reales, Humana issued to Ms. Reale an Organization Determination for $19,155.41. Ms. Reale was entitled to administratively appeal that amount but did not. The amount that Humana may recover is therefore fixed, at least as to Ms. Reale.") (citations omitted). Yet, MSPA's reliance on *Western Heritage* is misplaced – at least on this issue – because the case only considered the exhaustion of administrative remedies in connection with a Medicare beneficiary, not a primary plan. It is therefore unclear how *Western Heritage* has much relevance to the exhaustion of administrative remedies or how it undermines *Ocean Harbor* when the former looks to the appellate rights of a Medicare beneficiary and the latter examines a primary plan. In any event, we agree with the reasoning in *Ocean Harbor* because, even if MSPA had shown that

Covington could have appealed an "organization determination," there is nothing that allows it to do so under the MSPA Act or its associated regulations.

### (6) Whether Covington was Required to Make Any Payments

The question then becomes whether the policy provides any medical coverage for P.M.'s expenses to render Covington a primary payer.  Under § 1395y(b)(3)(A), a private cause of action does not arise until Medicare makes a conditional payment and that payment "can reasonably be expected to be made . . . under no fault insurance."  § 1395y(b)(2)(B)(ii).  And a payment "can reasonably be expected to be made" only when the applicable no fault policies and statutes require the payments.  *Id.*  That means, "for each reimbursement it claims, MSPA must demonstrate that, not only did it make a proper conditional payment under Medicare law, but also that [Covington] was required to make the payment in the first instance under Florida no-fault law."  *Ocean Harbor Cas. Ins.*, 261 So. 3d at 644; *see also Allstate Ins. Co.*, 835 F.3d at 1361 (stating that plaintiffs must "prove with evidence, that Defendants' valid insurance contracts *actually render Defendants responsible for primary payment* of the expenses Plaintiffs seek to recover.") (emphasis added).

The parties spend many pages going back and forth on whether there is any evidence that FHCP made an actual payment that Covington should have reimbursed.  The parties battle, for example, on whether a spreadsheet of diagnostic codes is reliable evidence of payment and if it qualifies as hearsay.  The parties also disagree strongly on whether a hearsay exception applies and, if so, how the Court should consider these spreadsheets in the disposition of two cross-motions for

summary judgment.  But, there is no need to consider the question of whether Covington made an actual payment if it was never required to do so in the first place under the insurance policy.

Covington says that, to answer that question, we must look at the underlying insurance policy because it requires the insurer to pay up to $5,000 in reasonable medical services if those expenses are incurred and reported *within one year* from the date of an accident.  [D.E. 135-4] ("We will pay medical expenses as described below for 'bodily injury' caused by an accident . . . provided that . . . the expenses are incurred and reported to us within one year of the date of the accident[.]")]. Covington accuses MSPA of failing to comply with this requirement because P.M.'s accident took place on February 25, 2014 and MSPA failed to give any notice until July 1, 2015 – well after the one-year policy limitation lapsed.

Covington also adds that everything in the record supports this undisputed fact and that MSPA conceded the point in its summary judgment papers[15]:

> Q. Okay. So was there a separate payment for $5,000 that was made or was that embedded or it become – became part and parcel of the 15,750?
> A. Medical payments coverage was not paid under the 3550 Palm Beach policy.
> Q. So then it's still available for use?
> A. No.
> Q. Why not? Why not?

---

[15]    In MSPA's response to Covington's statement of undisputed material facts, MSPA does not dispute that notice fell outside the one-year time requirement. [D.E. 147 at 3 ("Plaintiff does not dispute that notice was not provided within one-year from the date of the accident; however, this does not impact Defendant's liability as a primary payer as a matter of law as argued in Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment filed concurrently.")].

> A. Medical payments coverage condition of policy is for bills to be incurred and reported within one year of the date of the occurrence, and we did not have that report in within one year of occurrence.

[D.E. 135-6 at 138:12-24 (testimony of Mr. DeMint)].

> Q. Okay.  However, within that year, Covington never went back to Florida Healthcare Plus or its assignee, MSPA Claims 1, to reimburse Florida Healthcare Plus or MSPA Claims 1 for the medical bills that had been incurred and paid by Florida Healthcare Plus; correct?
> A. Correct.   But we didn't receive any lien notice from Florida Healthcare.  And the first lien notice from MSP, I believe, was in – I have some notes I can refer to on that file, but I believe it was July of 2015.

*Id.* at 151:21-152:6.

> A. As I stated, I think our first notice was in July of 2015.  I think we responded to a disclosure request and told them about the liability limits, but we did not mention medical payments.  We did not explain why we did not mention them.  And I would have to assume it was because they'd already expired.

*Id.* at 185:23-186:4.

> Q. When did MSP Recovery identify the P.M. claim as one involving an accident-related situation and a primary payer?
> A.  I believe it would be around the first letter that was sent, the first notice, which was at some point in 2015, I believe.

[D.E. 131-6 at 107:3-9 (testimony of Christopher Miranda)].  *see also* [D.E. 131-9 ("Please be advised that RSUI Group Inc. on behalf of Covington . . . is in receipt of your letter of July 21, 2015.")].

The reason Covington says that MSPA seeks to avoid any discussion of this evidence and the one-year time requirement under the policy is because, when an insurance policy requires the reporting of a claim within a specific time period and that condition is not met, coverage does not exist.  *See Solar Time Ltd. v. XL*

*Specialty Ins. Co.*, 142 F. App'x 430, 433 (11th Cir. 2005) (finding no coverage under the terms of an insurance policy because the "policy only protects the insured against claims made and reported during the policy period," and, since the policy expired on December 31, 1996, the policy did not cover a claim reported in June 1997) (citing *Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So. 2d 512, 515 (Fla. 1983) ("If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches.")).

The policy here is often referred to as a claims-made-and-reported policy "wherein the coverage of the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term. The essence, then, of a [claims-made-and-reported] policy is notice to the carrier within the policy period." *Gulf Ins. Co.,* 433 So. 2d at 514. This stands in contrast to an "occurrence policy" where "coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted." *Id.* (citing cases). Simply put, "while a failure to timely report a claim under an occurrence policy may not preclude coverage unless prejudice is established, claims-made-and-reported polices  are  essentially *reporting* policies." *Jennings Const. Servs. Corp. v. Ace Am. Ins. Co.*, 783 F. Supp. 2d 1209, 1212–13 (M.D. Fla. 2011) (quoting *Gulf Ins. Co.,* 433 So. 2d at 514); *see also Crowley Mar. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 931 F.3d 1112, 1120 (11th Cir. 2019) ("With claims-made policies, coverage is provided only where the act giving rise to coverage is

discovered and brought to the attention of the insurance company during the period of the policy.") (quotation marks and citation omitted); *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.,* 288 S.W.3d 374, 381 (Tex. 2009) ("Because the [notice and reporting requirement] is considered essential to coverage under a claims-made-and-reported policy, most courts have found that an insurer need not demonstrate prejudice to deny coverage when an insured does not give notice of a claim within the policy's specified time frame.") (citing cases). And since MSPA has failed to present any testimony or evidence that it complied with the one-year requirement, Covington asserts that it cannot be deemed a primary plan.

MSPA's response is that the Eleventh Circuit squarely rejected Covington's argument in *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 770 (11th Cir. 2020), when the Court supposedly found that there was no time limit to prevent an MAO from seeking reimbursement from a primary plan. But, *Kingsway* is an easily distinguishable case because the Court considered a completely different question than the one presented – namely, whether a failure to comply with the MSP Act's claims-filing provision was fatal to a suit against an insurer. *Id.* at 769-70 ("The central issue in this appeal is whether MSPA's failure to comply with the Medicare Secondary Payer Act's claims-filing provision, § 1395y(b)(2)(B)(vi), is fatal to its suit against Kingsway, as the district court concluded."). It is unclear as to how the MSP Act's claims-filing provision has any relevance to the notice requirements under an insurance policy and MSPA abandoned the opportunity to provide any clarification. MSPA only gave a cursory

one sentence remark suggesting that the Eleventh Circuit decision is directly on point and left the rest to the Court to determine if the comparison had any merit. We, of course, have no obligation to do the work that MSPA should have performed in the first place but, even after taking an independent review of *Kingsway*, we are at a loss as to how this case has any relevance.[16]

Having disposed of *Kingsway*, there is no evidence that Covington was required to make any payments towards P.M.'s medical expenses "in the first instance under Florida no-fault law," because of the one-year time limitation under the policy.  *Ocean Harbor Cas. Ins.*, 261 So. 3d at 644; *see also Allstate Ins. Co.*, 835 F.3d at 1361 (stating that plaintiffs must "prove with evidence, that Defendants' valid insurance contracts *actually render Defendants responsible for primary payment* of the expenses Plaintiffs seek to recover.") (emphasis added).  That strikes a fatal blow to the allegation that Covington is a primary payer because as we stated earlier – when an insurance policy requires the reporting of a claim within a specific time period and that condition is not met – coverage does not exist.

---

[16]    Although irrelevant, the claims-filing provision under the MSP Act reads as follows:

> Notwithstanding any other time limits that may exist for filing a claim under an employer group health plan, the United States may seek to recover conditional payments in accordance with this subparagraph where the request for payment is submitted to the entity required or responsible under this subsection to pay with respect to the item or service (or any portion thereof) under a primary plan within the 3-year period beginning on the date on which the item or service was furnished.

42 U.S.C. § 1395y(b)(3)(A).

All that MSPA offers in a last-ditch effort to avoid summary judgment is that Covington has, for all practical purposes, rewritten the MSP Act to impose requirements that do not otherwise exist.  That argument can be quickly rejected because it was MSPA's decision to rely on a contractual obligation as a sufficient demonstration of Covington's a responsibility for payment.  And when MSPA made that decision, it had to comply with the Eleventh Circuit's requirement that an MAO carry its burden to prove with evidence that Covington's insurance contract "actually render[s] [Covington] responsible for primary payment of the expenses Plaintiff[] seek to recover."  *Allstate*, 835 F.3d at 1361 (holding "that that a contractual obligation may serve as sufficient demonstration of responsibility for payment to satisfy the condition precedent to suit under the MSP Act," but that plaintiffs must "subsequently prove with evidence, that Defendants' valid insurance contracts actually render Defendants responsible for primary payment of the expenses Plaintiffs seek to recover.").  However, MSPA has failed to meet that burden because Covington was never responsible for making any payments for a policy that barred coverage.  And given that there is no other theory of liability as to how Covington qualifies as a primary payer, we recommend that Covington's motion for summary judgment be **GRANTED** as to count one and that MSPA's motion for summary judgment be **DENIED**.[17]

---

[17]   We omit any consideration of whether Covington rendered an actual payment towards P.M.'s medical expenses because, while it would be naturally follow this section, there is no need to do so when the policy bars coverage.

### D.   *Count II: Breach of Contract under 42 C.F.R. § 411.24(e)*

The final issue is Plaintiff's breach of contract claim in count two for a violation of 42 C.F.R. § 411.24(e).  This regulation says that "CMS has a direct right of action to recover from any primary payer."  *Id*.  MSPA alleges that Covington is committed a breach of contract when it had an obligation to pay for P.M.'s medical expenses after the slip and fall but Covington failed to do so.   [D.E. 55 at ¶ 62].

Covington argues that this count lacks merit because there is no contract between the parties, nor any claim that could have been assigned to MSPA. Covington says that the policy here is a third-party liability agreement with P.M. and that there is no testimony, evidence, or discovery to show that MSPA obtained an assignment to pursue this cause of action.  Thus, Covington asks that summary judgment also be entered as to count two.

Although the parties are at odds as to whether an assignment allows MSPA to pursue this claim and whether a contract exists, count two fails for an obvious reason that neither party considered because the statutory provision only allows a recovery *from a primary plan*.  *See* 42 C.F.R. § 411.24 ("Recovery from primary payers.  CMS has a direct right of action to recover from any primary payer.").  But, MSPA has already failed to show that Covington is a primary plan because there is no medical coverage available under the relevant insurance policy.  That resolves the disposition of count two and whether any relief is available under 42 C.F.R. § 411.24(e) because, since there is insufficient evidence that Covington is a primary plan, MSPA can seek no relief under this statute.  Accordingly, Covington's motion

for summary judgment should also be **GRANTED** as to count two and MSPA's motion for summary judgment should be **DENIED**.[18]

### IV. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that:

A.  Covington's motion for summary judgment [D.E. 130] be **GRANTED** in all respects.

B.  MSPA's motion for summary judgment [D.E. 134] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

---

[18]    We omit any discussion of MSPA's arguments in connection with Covington's affirmative defenses because, aside from the former relying on inapposite cases concerning a motion to dismiss, it changes nothing in the undersigned's recommendation.  Many of the arguments are also recycled in a contemporaneously filed motion to strike that the Court denied on April 13, 2021 because MSPA failed to follow the Federal Rules in seeking any timely relief.  [D.E. 165].  In any event, MSPA arguments are misplaced for the reasons previously explained and any further discussion of Covington's affirmative defenses would be redundant.

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 24th day of

May, 2021.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge